# FOR PUBLICATION



FILED

Oct 24 2013, 5:22 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**ERIC M. HYLTON**
**LAURA S. REED**
Riley Bennett & Egloff, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KATHY BRADLEY**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| PATRICIA TERKOSKY, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| vs. ) | No. 49A02-1212-PL-1000 |
| ) | |
| INDIANA DEPARTMENT OF ) | |
| EDUCATION, ) | |
| ) | |
| Appellee. ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Timothy W. Oakes, Judge
Cause No. 49D13-1010-PL-44515

**October 24, 2013**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

Patricia Terkosky appeals from the trial court's order affirming the decision of the Indiana Department of Education (the "IDOE") to suspend her teaching license for two years. She raises one issue which we revise and restate as whether the court erred in denying her petition for judicial review. We affirm.[1]

FACTS AND PROCEDURAL HISTORY

Terkosky was a licensed teacher, holding licenses in Indiana to teach students who were mildly mentally handicapped and/or learning disabled and students with severe disabilities. On March 10, 2010, Dr. Tony Bennett, the State Superintendent of Public Instruction (the "Superintendent"), issued a Recommendation for Licensure Action (the "Recommendation") against Terkosky in which he recommended that her license be revoked based upon immorality and misconduct in office. The Recommendation consisted of a form which stated: "Pursuant to IC 20-28-5-7, I recommend and request that the Department take the following action on the above-referenced licenses," and below listed four choices which could be selected by checking the appropriate box including to suspend the license for one year, to suspend the license for two years, to revoke the license, or to take no action at this time. Appellant's Appendix at 21. The form next noted that such action was being requested "[f]or the following reason(s)" and listed choices to again select by checking appropriate boxes corresponding with Ind. Code § 20-28-5-7, including immorality, misconduct in office, incompetency, willful neglect of duty, or that the "[a]lleged action does not satisfy the requirements of IC 20-

---

[1] We heard oral argument in this case on September 17, 2013, at Franklin College. We wish to thank counsel for their advocacy and extend our appreciation to the faculty, staff, and students of Franklin College for their hospitality.

28-5-7." Id. On March 19, 2010, the Superintendent by counsel filed a complaint against Terkosky, which was amended on March 24, 2010 to correct the caption, seeking revocation of her teaching licenses pursuant to Ind. Code § 20-28-5-7 based upon incidents in her classroom which occurred on March 3, 2010 and in September of 2008.

On June 15, 2010, a hearing before an Administrative Law Judge (the "ALJ") with the IDOE was held, and witnesses were sworn and testimony was heard. On September 13, 2010, the ALJ issued its order (the "ALJ's Order"), and, rather than ordering that Terkosky's teaching licenses be revoked, the ALJ ordered her teaching licenses be suspended for a period of two years. Specifically, after reciting the procedural history consistent with the foregoing, the ALJ's Order rendered the following Findings of Fact:

1. The [IDOE] has jurisdiction in this matter.

2. [Terkosky] holds the following Indiana Teaching Licenses #514284, 408770, and 404119, valid for the areas of learning disabled, mildly mentally handicapped, moderately mentally handicapped and multiply handicapped. She was employed for 23 years by the Greene-Sullivan Special Education Cooperative that provides special education services to six (6) school districts. [Terkosky] was at the time of the alleged incidents assigned to Worthington Elementary School in the White River Valley School District. Following an administrative hearing, [her] teaching contract was terminated on April 13, 2010.

3. [Judy] Thrasher, a physical therapy (PT) assistant in [Terkosky's] classroom, entered the room on a day in September 2008 and observed a student under the direction of [Terkosky] standing facing the chalkboard behind an easel or chart paper stand. Thrasher then sat at a computer with her back to the student and [Terkosky]. Thrasher heard [Terkosky] direct the student to face the chalkboard and then heard the sound of a strike on the easel/chart paper stand. She turned and saw [Terkosky] holding a yardstick. Thrasher heard this sound three times during the 15 minutes she was in the classroom; she observed [Terkosky] strike the easel/chart paper stand with the yardstick once. Before leaving the classroom

3

Thrasher observed [Terkosky] loosely drape a piece of opaque plastic over the top of the stand that covered the student's head to his shoulders. The student did not appear to be in distress, nor did Thrasher observe that other students in the room appeared distressed by the discipline. After leaving the classroom Thrasher drove to the office of [Patti] Weinheimer, the special education coordinator, and reported what she had observed. (Thrasher testimony)

4. Upon receiving Thrasher's report Weinheimer drove 15 minutes to Worthington Elementary to discuss the report with [Terkosky]. Weinheimer observed an easel/chart paper stand with plastic over the top in the classroom; no student was standing behind the easel or facing the chalkboard. Weinheimer advised [Terkosky] that if she had disciplined the student as reported, she should not do so again in the future. There was no allegation that the student was caused to stand at the board for an excessive length of time or that the student suffered injury. Weinheimer relayed the report to her superior and made no further investigation. She did not call Child Protective Services (CPS) or the police. (Weinheimer testimony)

5. [Tina] Baker, a paraprofessional assigned to [Terkosky's] classroom in September 2008, has no recollection of seeing, or being otherwise aware of, a student being disciplined as reported by Thrasher. (Baker testimony)

6. On March 3, 2010, Baker and Smith, another paraprofessional assigned to [Terkosky's] classroom, were assisting other students when they heard the sound of a "smack" and heard M.N. utter a startled cry. Neither Baker nor Smith saw what made the sound or caused M.N[.] to cry. After hearing the "smack" sound, Baker turned to observe M.N. with her hands up to her face, crying. Smith, who was in a curtained changing area with a student, observed M.N[.] crying, hands to her face, when she exited the changing area several minutes later. Baker observed [Terkosky's] demeanor as "a little frustrated." When M.N[.] was crying, she and [Terkosky] were both near the chalkboard. M.N. cried for a couple of minutes and then was back to her "normal self." (Baker testimony; Smith testimony)

7. A little later the same day, Smith observed an interaction between [Terkosky] and M.N. Baker was also in the room but was assisting other students. The students were practicing the skill of putting on and fastening their coats. After M.N. put her coat on and zipped it a couple of times she tired of the activity and refused to continue.

4

[Terkosky] directed M.N. repeatedly to continue the activity but M.N. refused, saying, "You're mean." M.N[.] began to wander away. [Terkosky] approached M.N., took hold of one of her arms firmly and led M.N. over to a chair where she pulled M.N. into the seat "a little hard." M.N. resisted and tried to pull away; [Terkosky] held her arm. The student was defiant and again refused to put on her coat; both [Terkosky's] and M.N[.]'s voices were raised as noted by Smith and Baker. Smith testified that a little later she observed redness on one of M.N[.]'s arms. Smith's sworn testimony as to which arm [Terkosky] gripped and where Smith later observed redness is inconsistent. At the contract termination hearing Smith testified [Terkosky] gripped M.N[.]'s right arm and Smith saw subsequent redness there. In this matter she testified that her prior testimony was inaccurate and [Terkosky] actually gripped and left a red mark on M.N[.]'s left arm. (Baker testimony; Smith testimony)

8.    The following day Smith noticed a bruise on the inside of M.N[.]'s left arm and took her to [Pam] Kirk, the school nurse. Kirk recorded the location and size of the bruise on a standard incident form and she contacted M.N[.]'s parents and principal [Kevin] Keller. Kirk did not question M.N. about the cause of the bruise. The incident form notes the bruise is of unknown origin. Smith cannot state conclusively the source of the bruise. (Smith testimony; Kirk testimony; State's Exhibit G)

9.    M.F. was a student in [Terkosky's] classroom on March 3, 2010. M.F. is nine years old. Among M.F[.]'s disabilities, M.F. is diagnosed with Pica, a disorder characterized by mouth tactile needs resulting in the ingesting of inedible objects. M.F. is verbal and can communicate ([Linda] Fish testimony; [Judy] Flowers testimony; [Nancy] Patterson testimony)

10.   Near the end of the day on Mar. 3[,] Patterson, a teacher's assistant in [Terkosky's] classroom, heard [Terkosky] ask M.F. if she had [Terkosky's] eraser. Patterson was behind M.F. about 2 feet away. Patterson observed that M.F. was holding a large pink eraser. In response to [Terkosky's] question, M.F. replied, "You're mean." Patterson saw [Terkosky] approach M.F. and "pop" her on the lips with the index, third and fourth fingers of one hand. During testimony Patterson demonstrated the "pop" to opposing counsel and the ALJ showing firm, but not forceful, contact with the lips. Patterson testified the "pop" to M.F[.]'s mouth made no sound and left no mark on the skin; M.F. did not visibly react or step back to avoid [Terkosky's] contact with her mouth. Patterson did not

observe any sign that M.F. was choking and she did not see M.F. spit out an eraser. M.F. cried briefly. [Terkosky] told M.F. she would have to ride the second bus home. The students perceive waiting to ride the second bus as a disciplinary consequence. Patterson heard [Terkosky] remark that now M.F. can see how mean she really ([Terkosky]) can be, but did not know whether [Terkosky] was referring to the "pop" on the mouth or making M.F. ride the second bus. The following day Patterson reported her observation of [Terkosky] "popping" M.F. in the mouth to principal Keller. (Patterson testimony; Respondent's Exhibit 1)

11. Kevin Keller has been the principal of Worthington Elementary School for 11 years. In the course of his official duties he routinely investigates complaints and incident reports and makes contemporaneous notes and summaries. On March 4, 2010, Keller began to investigate the Mar. 3 incident involving M.F. When questioned by Keller [Terkosky] denied her purpose in touching M.F[.]'s mouth was disciplinary and explained the purpose was to remove an eraser from her mouth on which she could choke. Keller received a call from Ms. Fish, M.F.'s mother, also on Mar. 4, to report that her daughter had been "slapped" by [Terkosky]. His notes, made contemporaneous with their conversation, indicate that Fish told him her child was chewing on an eraser and that started the chain of events the previous day. Mr. Keller did not make a police report; he reported the alleged incident to the director of the special education cooperative, Judy Flowers. The school nurse called CPS. A police investigation was undertaken. (Keller testimony; State's Exhibit D)

12. Keller testified that the school policy on corporal punishment specifies that corporal punishment is permitted, but only the principal may administer corporal punishment. (Keller testimony; State's Exhibit B)

13. Fish testified that her daughter, M.F[.], was tearful and agitated when she arrived home from school on Mar. 3. Fish asked her what happened and M.F. said that [Terkosky] "slapped" her. Fish then questioned her son, D.F., who is also in [Terkosky's] classroom. D.F. stated that [Terkosky] "slapped" M.F. because M.F. had her eraser. M.F. later admitted to her mother that she had [Terkosky's] eraser and told [Terkosky] "no, you're a meanie" when [Terkosky] asked for the eraser. Fish called Keller in the morning of Mar. 4 to report the incident. Shortly after Fish spoke to Keller, Fish received

a call from [Terkosky] to discuss the incident. [Terkosky] denied that she had "smacked" M.F. in the mouth. (Fish testimony)

14. On Mar. 4, M.F. did not want to go to school. M.F[.] wet her bed the night of Mar. 3, which was unusual, and she expressed anxiety to her mother that [Terkosky] was going to "get her." M.F. went to school Mar. 4 but stayed home the following day. She then returned to school and has been attending since. She has continued to have bedwetting problems since Mar. 3 although [Terkosky] has not been in the classroom since Mar. 4. (Fish testimony)

15. Judy Flowers has been the director of the Green-Sullivan Special Education Cooperative for 6 years. On Mar. 4, following a report from principal Keller regarding the incident with M.F. and a discussion with the superintendent of White River Valley School District, Flowers contacted [Terkosky] and placed her on administrative leave with pay pending an investigation. Following her investigation Flowers made a recommendation to the school board to terminate [Terkosky's] employment contract. (Flowers testimony)

16. Flowers testified that if a student had an object in his or her mouth on which the student might choke, she would certainly want the teacher to take steps to prevent the child from choking. Flowers testified that other teachers within the cooperative occasionally raise their voices when dealing with students. Raising the voice is generally not an effective strategy, but teachers other than [Terkosky] have and continue to do so. (Flowers testimony)

17. [Terkosky] does not recall placing a student between an easel/chart paper stand and the chalkboard, striking the easel with a yardstick, or placing plastic over a student's head in September 2008. She does not recall Weinheimer discussing Thrasher's incident report with her; she was not questioned by CPS or the police about the alleged incident. (Terkosky testimony)

18. [Terkosky] does not recall any events out of the ordinary on Mar. 3, 2010, involving M.N. She was not interviewed by CPS or police about the arm gripping incident with M.N[.], nor is she aware of any school or co-op investigation of that alleged incident. (Terkosky testimony)

19. [Terkosky] testified that on Mar. 3 she made contact with M.F[.]'s lips/mouth with the fingers of one hand for the purpose of removing

7

an eraser that she believed was in M.N[.]'s mouth and on which the student might choke. The student's disability causes her to put inedible objects in her mouth. Following [Terkosky's] contact with M.F[.]'s mouth, M.F. cried briefly. It is unclear whether M.F. was crying because [Terkosky] touched her mouth or because she was told to ride the second bus home. (Terkosky testimony)

Appellant's Appendix at 131-134.

The ALJ's Order proceeded to state its Conclusions of Law which began by noting that the IDOE had both personal and subject matter jurisdiction and that "[a]ny Finding of Fact deemed to be a Conclusion of Law is hereby denominated as such. Any Conclusion of Law deemed to be a Finding of Fact is hereby denominated as such." Id. at 134. The order recited Ind. Code § 20-28-5-7, noted that the authority granted by that statute was repeated at 515 Ind. Admin. Code 9-1-18, and observed that "[t]here are no Indiana cases interpreting IC 20-28-5-7 or defining what constitutes immorality or misconduct for purposes of teacher license revocation." Id. at 135. The order then noted that "Indiana courts have considered the term 'immorality' and generally have determined conduct to be immoral if the conduct is offensive to the morals of the community and has a negative impact on the teacher's students," and cited to the case of Fiscus v. Bd. of Sch. Trs., 509 N.E.2d 1137 (Ind. Ct. App. 1987), reh'g denied, trans. denied, which adopted a definition of immorality as follows: "not essentially confined to a deviation [from sex] morality; it may be such a course of conduct as offends the morals of the community and is a bad example to the youth whose ideals a teacher is supposed to foster and elevate." Id. (citing Fiscus, 509 N.E.2d at 1141 (quoting Horosko v. Mount Pleasant Twp. Sch. Dist., 6 A.2d 866, 868 (Pa. 1939), cert. denied, 308 U.S. 553, 60 S. Ct. 101 (1939))). The order next observed that this definition "is not significantly

8

different from the definition of 'misconduct'" provided by the American Heritage Dictionary "as 'behavior not conforming to prevailing standards of law; impropriety.'" Id. The ALJ's Order also observed that "[t]he generally accepted definition of 'misconduct in office,' is 'any unlawful behavior by a public officer in relations to the duties of his office, willful in character.'" Id. (quoting BLACK'S LAW DICTIONARY 901 (5th ed. 1979)).

The ALJ's Order then discussed what it termed "an influential case in this arena" from the California Supreme Court, which found "that the terms 'immoral' and 'unprofessional' are subject to such broad definition to be of little help" and identified seven factors to be "considered when attempting to determine whether a teacher's conduct constitutes unfitness to teach . . . ." Id. (citing Morrison v. State Bd. of Educ., 461 P.2d 375 (Cal. 1969)). The order noted that the "Indiana Administrative Code repeats substantially the same factors noted in *Morrison* to be considered in a determination of a teacher's fitness to have a license reinstated following revocation or suspension" under 515 Ind. Admin. Code 9-1-18(h) except that the Indiana regulations contain an additional factor, "evidence of rehabilitation," which "is more appropriate to those seeking the reinstatement of a revoked or suspended license and is not applicable in the instant analysis." Id. at 136. The ALJ's Order then applied the Morrison factors to the facts presented and concluded:

> Based on analysis of the facts of the present case against the *Morrison* factors, the most serious aggravating factor is that all students involved in the allegations against [Terkosky] are young special needs students. However, extenuating factors present under the *Morrison* analysis militate against a finding that revocation is the only appropriate sanction in this matter. Under IC 20-28-5-7, the department may "revoke or suspend" a

9

license. While counsel for the State Superintendent seeks revocation for the full three years provided by law, the department may impose a suspension rather than a revocation when the totality of the evidence tips the balance in favor of a lesser sanction.

Id. at 137. The ALJ ordered that Terkosky's teaching licenses be suspended for two years from the date of the order.

On October 12, 2010, Terkosky filed a petition for judicial review in the Marion County Superior Court, and on December 6, 2010, the IDOE filed its answer to Terkosky's petition.[2] On November 22, 2011, Terkosky filed a motion for judgment on the administrative record and a supporting memorandum in the Marion County Superior Court. On January 9, 2012, the IDOE filed its memorandum in opposition to Terkosky's motion, and on February 3, 2012, Terkosky filed her reply brief. On March 6, 2012, the court held a hearing in which the parties presented arguments on Terkosky's motion.

On March 12, 2012, the court made the following entry on the Chronological Case Summary ("CCS"): "Court approves order on judicial review. The court affirms the administrative law judge's decision." Id. at 4. On April 10, 2012, Terkosky filed a motion to correct error, and on April 18, 2012, the court granted the motion in part, noting that it was vacating its earlier order and would issue a new order with findings of fact and conclusions of law pursuant to Ind. Trial Rule 52. The court also requested that the parties submit proposed findings and conclusions. On May 9, 2012, the IDOE submitted proposed findings and conclusions, and on November 20, 2012, the court approved the IDOE's proposed findings and conclusions as its final order in which it affirmed the ALJ's Order.

---

[2] Neither Terkosky's petition nor the IDOE's answer appear in the record.

ISSUE AND STANDARD OF REVIEW

The issue is whether the court erred in affirming the decision of the ALJ. Judicial review of an administrative decision is limited under the Administrative Orders and Procedures Act ("AOPA"). Huffman v. Office of Envtl. Adjudication, 811 N.E.2d 806, 809 (Ind. 2004). Agency action subject to AOPA will be reversed only if the court "determines that a person seeking judicial relief has been prejudiced by an agency action that is: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence." Id.; see Ind. Code § 4-21.5-5-14(d).

A trial court and an appellate court both review the decision of an administrative agency with the same standard of review. See St. Charles Tower, Inc. v. Bd. of Zoning Appeals of Evansville-Vanderburgh Cnty., 873 N.E.2d 598, 600 (Ind. 2007). In reviewing the decision of an administrative agency, we defer to the agency's expertise and will not reverse simply because we may have reached a different result. Filter Specialists, Inc. v. Brooks, 906 N.E.2d 835, 844 (Ind. 2009). "The burden of demonstrating the invalidity of agency action is on the party to the judicial review proceeding asserting invalidity." Ind. Code § 4-21.5-5-14(a). "Review of an agency's decision is largely confined to the agency record, and the court may not substitute its judgment for that of the agency." Bd. of Comm'rs of LaPorte Cnty. v. Great Lakes Transfer, LLC, 888 N.E.2d 784, 788-789 (Ind. Ct. App. 2008) (internal quotations

11

omitted). We give deference to an administrative agency's findings of fact, if supported by substantial evidence, but review questions of law *de novo*. Id. (citing Huffman, 811 N.E.2d at 809). On review, we do not reweigh the evidence. Davidson v. City of Elkhart, 696 N.E.2d 58, 61 (Ind. Ct. App. 1998), trans. denied.

As noted above, on judicial review, the reviewing court is bound by an agency's findings of fact if those findings are supported by substantial evidence. Ind. Civil Rights Comm'n v. S. Ind. Gas & Elec. Co., 648 N.E.2d 674, 679 (Ind. Ct. App. 1995), trans. denied. Indiana courts have defined substantial evidence as something "more than a scintilla, but something less than a preponderance of the evidence." State v. Carmel Healthcare Mgmt. Inc., 660 N.E.2d 1379, 1384 (Ind. Ct. App. 1996), trans. denied; see also Ind. Family and Soc. Servs. Admin. v. Pickett, 903 N.E.2d 171, 177 (Ind. Ct. App. 2009) ("Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (internal quotations omitted), aff'd and clarified on reh'g. Only if the agency action is unsupported by substantial evidence or is contrary to law may it be reversed. Lutheran Hosp. of Ind., Inc. v. Ind. Dep't of Pub. Welfare, 597 N.E.2d 1301, 1304 (Ind. Ct. App. 1992), trans. denied.

Also, an administrative decision is arbitrary and capricious only when it is willful and unreasonable, without consideration or in disregard of the facts and circumstances of the case, or without some basis which could lead a reasonable person to the same conclusion. Indianapolis Downs, LLC v. Ind. Horse Racing Comm'n, 827 N.E.2d 162, 170 (Ind. Ct. App. 2005).

This case requires this court to interpret Ind. Code § 20-28-5-7. "The first step in interpreting a statute is to determine whether the Legislature has spoken clearly and unambiguously on the point in question." City of Carmel v. Steele, 865 N.E.2d 612, 618 (Ind. 2007). When a statute is clear and unambiguous, we need not apply any rules of construction other than to require that words and phrases be taken in their plain, ordinary, and usual sense. Id. Clear and unambiguous statutes leave no room for judicial construction. Id. However, when a statute is susceptible to more than one interpretation it is deemed ambiguous and, thus, open to judicial construction. Id. When faced with an ambiguous statute, we apply other well-established rules of statutory construction. Id. One such rule is that our primary goal is to determine, give effect to, and implement the intent of the Legislature. Id. To effectuate legislative intent, we read the sections of an act together in order that no part is rendered meaningless if it can be harmonized with the remainder of the statute. Id. A statute should be examined as a whole, avoiding excessive reliance upon a strict literal meaning or the selective reading of individual words. Mayes v. Second Injury Fund, 888 N.E.2d 773, 776 (Ind. 2008). We presume that the legislature intended for the statutory language to be applied in a logical manner consistent with the statute's underlying policy and goals. Id.

Also, "although an agency's interpretation of a statute is entitled to great weight, courts rather than administrative agencies must resolve questions of statutory construction." Ind. Civil Rights Comm'n v. Alder, 714 N.E.2d 632, 636 (Ind. 1999); see also S. Newton Sch. Corp. Bd. of Sch. Trs. v. S. Newton Classroom Teachers Ass'n, 762 N.E.2d 115, 118 (Ind. Ct. App. 2001) ("An interpretation of a statute by an administrative

13

agency charged with the duty of enforcing the statute is entitled to great weight, unless this interpretation would be inconsistent with the statute itself.") (quoting Weiss v. Ind. Family & Soc. Servs. Admin., Div. of Disability, Aging & Rehabilitative Servs., 741 N.E.2d 398, 406 (Ind. Ct. App. 2000), (quoting LTV Steel Co. v. Griffin, 730 N.E.2d 1251, 1257 (Ind. 2000) (citations omitted)), trans. denied), trans. denied. "If an agency misconstrues a statute, there is no reasonable basis for the agency's ultimate action," and the reviewing court is "required to reverse the agency's action as being arbitrary and capricious." S. Newton Sch. Corp. Bd. of Sch. Trs., 762 N.E.2d at 118.

Further, the Indiana Supreme Court has explained:

> If the reviewing court finds, on an issue properly preserved for judicial review, that the record before the board does not support the board action, that the board has not considered all relevant factors, or that it simply cannot evaluate the challenged board action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the board for additional investigation or explanation.

Med. Licensing Bd. of Ind. v. Provisor, 669 N.E.2d 406, 410 (Ind. 1996) (citing Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744, 105 S. Ct. 1598, 1607 (1985)).

## DISCUSSION

The relevant statute in this matter, Ind. Code § 20-28-5-7, governs the revocation and suspension of teaching licenses and provides:

> On the written recommendation of the state superintendent, the department may suspend or revoke a license for:
>
> (1)    immorality;
>
> (2)    misconduct in office;
>
> (3)    incompetency; or

14

(4)     willful neglect of duty.

For each suspension or revocation, the department shall comply with IC 4-21.5-3.

Ind. Code §§ 4-21.5-3 governs adjudicative proceedings under the AOPA. To the extent that the issues presented in this case implicate the AOPA and specifically Chapter 3, the following from Ind. Code § 4-21.5-3-27 provides:

(a)     If the administrative law judge is the ultimate authority for the agency, the ultimate authority's order disposing of a proceeding is a final order. . . .[3]

(b)     This subsection applies only to an order not subject to subsection (c). The order must include, separately stated, findings of fact for all aspects of the order, including the remedy prescribed and, if applicable, the action taken on a petition for stay of effectiveness. Findings of ultimate fact[4] must be accompanied by a concise statement of the underlying basic facts of record to support the findings. The order must also include a statement of the available procedures and time limit for seeking administrative review of the order (if administrative review is available).

---

[3] Ind. Code § 4-21.5-3-9 provides in part:

(a)     Except to the extent that a statute other than this article limits an agency's discretion to select an administrative law judge, the ultimate authority for an agency may:

(1)     act as an administrative law judge;

(2)     designate one (1) or more members of the ultimate authority (if the ultimate authority is a panel of individuals) to act as an administrative law judge; or

(3)     designate one (1) or more other individuals, not necessarily employees of the agency, to act as an administrative law judge.

[4] Ultimate facts are facts that involve an inference or deduction based on the findings of basic fact. Recker v. Review Bd. of Ind. Dep't of Workforce Dev., 958 N.E.2d 1136, 1139 (Ind. 2011) (citing McClain v. Review Bd. of Ind. Dep't of Workforce Dev., 693 N.E.2d 1314, 1317 (Ind. 1998), reh'g denied). "These questions of ultimate fact are sometimes described as 'questions of law.' They are, however, more appropriately characterized as mixed questions of law and fact. As such, they are typically reviewed to ensure that the [ALJ's] inference is 'reasonable' or 'reasonable in light of [the ALJ's] findings.'" Perry v. Unemployment Ins. Rev. Bd. of Ind. Dep't of Workforce Dev., 984 N.E.2d 1275, 1279 (Ind. Ct. App. 2013).

(d)     Findings must be based exclusively upon the evidence of record in the proceeding and on matters officially noticed in that proceeding. Findings must be based upon the kind of evidence that is substantial and reliable. The administrative law judge's experience, technical competence, and specialized knowledge may be used in evaluating evidence. . . .

Ind. Code § 4-21.5-3-27.

In her brief, Terkosky raises a number of arguments, including: (A) the court erred in concluding that the ALJ possessed the authority to impose a sanction not authorized by the State Superintendent's written recommendation; and (B) the court erred in finding that the ALJ's Order complied with Section 7 for a number of reasons. We address each of Terkosky's arguments separately.

A.     Authority of ALJ to Impose Sanction

First, Terkosky challenges the ALJ's authority to impose the lesser sanction of suspension, arguing that the ALJ's Order "was based on an erroneous interpretation" of Section 7 in that, although the Superintendent recommended only that her licenses be revoked for immorality and misconduct in office, the ALJ instead imposed a two-year suspension of her licenses. Appellant's Brief at 14. Terkosky notes that the ALJ in her order asserted the authority to "impose a suspension rather than a revocation when the totality of the evidence tips the balance in favor of a lesser sanction," but the ALJ "did not cite to any authority" in making this assertion. Id. (emphasis omitted). Terkosky asserts that the statutory language is simple and provides that "[o]n the written recommendation of the state superintendent, the department may suspend or revoke a

license . . . ," and that the statute does not provide that the IDOE "may elect to either (i) suspend or (ii) revoke a license, depending on the severity of the conduct at issue," contending that this decision "lies with the state superintendent." Id. at 15.

Terkosky argues that the IDOE has produced a form for superintendents to use in order to take action against teaching licenses and notes that "[t]he form provides check boxes for '[s]uspend the license for one year,' '[s]uspend the license for two years,' '[r]evoke the license,' and '[t]ake no action at this time.'" Id. She states that the Superintendent checks one or more of these boxes to indicate his recommendation based on the alleged conduct. She also notes that the form similarly provides check boxes corresponding with the four statutory reasons for suspension or revocation of a teaching license, as well as a fifth box indicating that the alleged action does not satisfy the requirements of the statute, and that the superintendent selects one or more of the reasons as the basis for his recommendation. Terkosky surmises that the IDOE, in creating such a form, "establishes that [it] interprets the statute to mean that (i) it may only impose those sanctions that are specifically recommended by the Superintendent and (ii) it does not have discretion to impose a different sanction." Id. at 16. She also contends that the ALJ's interpretation renders "the statutory requirement of the Superintendent's recommendation of licensure action pointless" because the legislature "would not have required the Superintendent to recommend action if the [IDOE] is free to take whatever action it deems appropriate in its discretion." Id.

Terkosky finally argues that the court erred in relying upon the case of Fort Wayne Educ. Ass'n v. Fort Wayne Cnty. Schs., 753 N.E.2d 672 (Ind. Ct. App. 2001), for the

17

proposition that the ALJ "had sweeping authority to determine what type of action to take" because that case "concerned an arbitration conducted pursuant to a collective bargaining agreement, which is a procedure wholly different from a proceeding before an administrative agency" and accordingly "has no application here . . . ." Id. at 17. She states that the court's reliance on Ind. Code § 20-28-5-3 in finding that the IDOE has "sweeping authority" is erroneous because that statute "states the department shall determine the details of licensing 'not provided in this chapter'" and Section 7 "is part of the chapter and specifies the details regarding suspension and revocation including the requirement of the [S]uperintendent's recommendation." Id. Her position is that the ALJ's interpretation of the statute was erroneous, the ultimate finding of suspension has no reasonable basis, and the Order must be overturned as arbitrary and capricious.

The IDOE posits that Terkosky's interpretation of Section 7 ignores the plain language of the statute and the roles of the Superintendent and the IDOE. Its position is that there is no mandatory language in the statute that requires it to adopt the exact recommendation of the Superintendent, and this Court should not read language into the statute. The IDOE also argues that "the statute uses the term 'may' which ordinarily implies a permissive condition and a grant of discretion" and "only where the word 'shall' is used that the language is construed as mandatory . . . ." Appellee's Brief at 9. The IDOE contends that Terkosky's arguments ignore the dual roles of the IDOE and Superintendent, Ind. Code § 20-28-5-3 which provides that "the 'department shall determine details of licensing not provided in this chapter,'" and Ind. Code § 4-21.5-3-9 which notes that "the ALJ serves in the stead of the ultimate authority for the [IDOE]."

Id. at 10.   The IDOE's position is that it receives the superintendent's recommendation, and while the recommendation may be necessary to commence the proceeding, it is then ultimately the province of the ALJ to determine what action is appropriate on a licensure matter.   Therefore the IDOE, by extension the ALJ, is not limited on the action it can take pursuant to the Superintendent's recommendation.   The IDOE states that Terkosky's argument regarding the form used by the superintendent is similarly unavailing because it, "like the statute . . . states that the [S]uperintendent may *recommend* action to the *department*.   This then leaves discretion to the [IDOE] whether to pursue the matter and in no way limits the manner or measure of the authority of the [IDOE] to enforce licensure standards." Id. at 11.

In her reply brief, Terkosky posits that the discretion allowed by the word 'may' in the statute is the discretion to decide whether the facts found by the IDOE may support the sanction recommended by the Superintendent, and "[i]f the word 'shall' were used, then the IDOE would be <u>required</u> to impose the recommended sanction . . . ." Appellant's Reply Brief at 3.

Again, Section 7 provides that "[o]n the written recommendation of the state superintendent, the department may suspend or revoke a license . . . ."   Our interpretation of this clause is the same as that of the IDOE: Section 7 assigns to the Superintendent the role of initiating proceedings against a teaching license, and it assigns to the IDOE the role of determining the action to take against the license.

Indeed, we find that accepting Terkosky's interpretation of Section 7 that the IDOE, and by extension the ALJ, is limited by which field is selected on the

recommendation form filed by the Superintendent, and that in this instance the ALJ was given the choice between the most severe punishment, revocation, or no punishment, would be illogical. The legislature has ceded to the IDOE the authority to enforce licensure standards and to determine the details of licensing, see Ind. Code § 20-28-5-3, and therefore we do not believe it would have intended for Section 7 to be interpreted in such a fashion as to award the power to determine the action to take against a teaching license to the Superintendent, with the IDOE having only the power to determine whether the Superintendent's recommended action was warranted. Cf. Fort Wayne Educ. Ass'n, 753 N.E.2d at 675-676 (internal quotations omitted) (noting that language in the Indiana Uniform Arbitration Act that a court may vacate an arbitration award because "the arbitrators exceeded their powers and the award can not be corrected without affecting the merits of the decision upon the controversy submitted" is "to be narrowly construed" because it "does not attempt to limit the discretion and powers of a neutral arbitrator to whom a controversy has been duly submitted").

B.    Whether the ALJ's Order Complied with Ind. Code § 20-28-5-7

Terkosky asserts that the ALJ's Order failed to comply with Section 7, arguing that, (1) the order does not contain specific findings of basic facts and merely narrates the testimony heard at the hearing; (2) the order does not conclude that her conduct constituted immorality or misconduct in office and instead applied Morrison; and (3) regardless of the test used by the ALJ, the ALJ's Order is not supported by substantial evidence.

20

1.    *Satisfactoriness of Findings of Fact*

Terkosky argues that Section 7 requires compliance with Ind. Code § 4-21.5-3-27(b) and -27(c) "which in turn requires that '[f]indings of ultimate fact must be accompanied by a concise statement of underlying basic facts of record to support the findings.'" Appellant's Brief at 19. She also notes that "the Indiana Administrative Code provides that an agency's order must include findings of basic fact and the reasons therefore, specifying applicable rules and regulations and relevant evidence that bears on the ALJ's determination of what the facts are." Id. (citing 405 Ind. Admin. Code § 1.1-1-6(b)). She asserts that "findings which simply recite what the testimony was or what evidentiary documents contained are defective," and she argues that this is precisely what the ALJ's Order did. Id. at 20. Specifically, she points to examples in the ALJ's Order including Finding 7 which noted that "Smith testified that a little later she observed redness on one of M.N.'s arms" and that Smith changed her testimony between her deposition and the hearing, but the ALJ did not identify which testimony she found most credible. Id. Terkosky also notes the ALJ's findings regarding her own testimony in which the ALJ in her order noted that Terkosky "does not recall placing a student between an easel/chart paper stand and the chalkboard," and another point reciting that another witness who was an assistant in the room never observed any such incident. Id. Terkosky contends that indeed the order does not determine or conclude that the incident happened. Finally, she asserts that this deficiency is highlighted by the trial court's order, specifically pointing to the fact that it states that she slapped a disabled child in the face, but that the ALJ's Order "recited the testimony and specified that no one saw a 'slap'"

21

and "the ALJ did <u>not</u> determine that any slap in the face or elsewhere had actually occurred." <u>Id.</u> at 21.

The IDOE agrees with Terkosky that it is a correct statement of Indiana law that mere recitations of witnesses' testimony are not true findings of fact, but maintains that the inclusion of such statements are not harmful error and are considered "mere surplusage" if they are not essential to the ALJ's conclusions. Appellee's Brief at 13. The IDOE states that there are only a few instances in which the ALJ gave a direct recitation of witness testimony and that even without these few instances, the ALJ's order is sufficient to determine what facts she relied on to come to the decision that action was warranted. The IDOE also posits that "even if this Court finds the findings of fact are deficient, the remedy is not reversal, but remand." <u>Id.</u> at 14.

In her reply, Terkosky discusses "the arm-touching incident" and notes that the ALJ's Order indicates that Smith changed her testimony between her deposition and the hearing, but never states which testimony the ALJ found most credible. She asserts that the ALJ did not make a finding of redness or that the incident caused a bruise, and notes that the IDOE cites to the hearing transcript rather than the ALJ's Order for the proposition that she grabbed M.N. roughly and "sat her down hard." Appellant's Reply Brief at 5 (quoting Appellee's Brief at 19). She also notes that the deficiencies of the ALJ's Order are highlighted by the trial court's findings, pointing specifically to the finding that she "slapped a disabled child in the face" but the ALJ "specified that no one saw a 'slap.'" <u>Id.</u> at 6.

In Perez v. U.S. Steel Corp., 426 N.E.2d 29, 33 (Ind. 1981), the Indiana Supreme Court reviewed an appeal from an administrative proceeding in which the plaintiff challenged the Industrial Board's Workmen's Compensation determination. Perez, 426 N.E.2d at 30. The Indiana Supreme Court determined that the findings supplied by the Board did "not reveal the factual basis for the Board's ultimate determination of Perez's claim, which is the quintessential purpose of the requirement that administrative agencies enter specific findings of fact as part of their orders." Id. The Court, citing numerous appeals from administrative proceedings, noted that "[o]ur courts have repeatedly emphasized the imperative nature of the need for specific findings of fact." Id. at 31.[5] The Court stated that its "insistence" on requiring specific findings of fact was "predicated" on the notion that "specific findings of fact are essential to an effective system of administrative law." Id.

The Court went on to note that "[t]he findings must be specific enough to provide the reader with an understanding of the Board's reasons, based on the evidence, for its finding of ultimate fact," but also emphasized that "statements to the effect that 'the evidence revealed such and such . . . ,' that 'Mr. Jones testified so and so . . . ,' or that 'the Industrial Board finds Dr. Smith testified so and so . . . ,' are not findings of basic fact in the spirit of the requirement." Id. at 33. The Court further stated that "[t]he

---

[5] For this statement, the Court provided citation to authority as follows: "See, e.g., Talas v. Correct Piping Co., Inc., (1981) Ind., 416 N.E.2d 845; Hawley v. South Bend Dept. of Redevelopment, [270 Ind. 109, 383 N.E.2d 333 (1978)]; Kunz v. Waterman, [258 Ind. 573, 283 N.E.2d 371 (1972)]; Uhlir v. Ritz, (1970) 255 Ind. 342, 264 N.E.2d 312; Carlton v. Bd. of Zoning Appeals, (1969) 252 Ind. 56, 245 N.E.2d 337; Indiana Bell Telephone Co., Inc. v. Owens, (1980) Ind. App., 399 N.E.2d 443; Penn-Dixie Steel Corp. v. Savage, (1979) Ind. App., 390 N.E.2d 203; Yunker v. Porter County Sheriff's Merit Bd., (1978) Ind. App., 382 N.E.2d 977; Whispering Pines Home for Senior Citizens v. Nicalek, (1975) Ind. App., 333 N.E.2d 324." Perez, 426 N.E.2d at 31.

inclusion of statements of that nature is not harmful error, but rather mere surplusage."

Id.

Here, Terkosky highlights Finding 7 which states:

A little later the same day, Smith observed an interaction between [Terkosky] and M.N. Baker was also in the room but was assisting other students. The students were practicing the skill of putting on and fastening their coats. After M.N. put her coat on and zipped it a couple of times she tired of the activity and refused to continue. [Terkosky] directed M.N. repeatedly to continue the activity but M.N. refused, saying, "You're mean." M.N[.] began to wander away. [Terkosky] approached M.N., took hold of one of her arms firmly and led M.N. over to a chair where she pulled M.N. into the seat "a little hard." M.N. resisted and tried to pull away; [Terkosky] held her arm. The student was defiant and again refused to put on her coat; both [Terkosky's] and M.N[.]'s voices were raised as noted by Smith and Baker. *Smith testified that a little later she observed redness on one of M.N[.]'s arms. Smith's sworn testimony as to which arm [Terkosky] gripped and where Smith later observed redness is inconsistent. At the contract termination hearing Smith testified [Terkosky] gripped M.N[.]'s right arm and Smith saw subsequent redness there. In this matter she testified that her prior testimony was inaccurate and [Terkosky] actually gripped and left a red mark on M.N[.]'s left arm.* (Baker testimony; Smith testimony)

Appellant's Appendix at 132-133 (emphasis added).

It is clear that in Finding 7, the ALJ found that Terkosky did indeed grab M.N. by the arm, led her to her chair, pulled her into a seat "a little hard," held her arm, and raised her voice. To the extent that Finding 7 contains statements that "Smith testified" to certain things, we note that this finding may be interpreted as that the ALJ found that Smith contradicted herself as to which arm Terkosky grabbed, but that she subsequently clarified "that her prior testimony was inaccurate and [Terkosky] actually gripped and left a red mark on M.N[.]'s left arm." Also, regarding the "smack" against M.N. noted in Finding 6, that finding appears to specifically find that Baker and Smith did indeed hear

"the sound of a 'smack' and heard M.N. utter a startled cry," and it notes that they did not actually witness what made the sound. Nothing contained in Finding 6 appears to be surplusage.

Finally, to the extent that the ALJ's Order recites the crux of what Terkosky testified to and that Terkosky suggests, based thereon, that the ALJ did not "determine or conclude" that certain incidents happened, we note that the balance of the ALJ's findings appear to recite what the ALJ found to have happened, and Findings 17-19 merely recite Terkosky's testimony, specifically her memory (or lack thereof) of the events, and are present to memorialize Terkosky's version of them. Such findings, although perhaps surplusage, do not cast doubt on whether the ALJ in her order found that the incidents in question occurred. We therefore conclude that the Findings of Fact contained in the ALJ's Order were satisfactory.

2. *Conclusions of Law and Application of <u>Morrison</u>*

First, Terkosky notes that Section 7 "mandates a finding that a teacher's conduct constitutes, *inter alia*, 'immorality' or 'misconduct in office' before a suspension or revocation determination can be rendered" and "[n]owhere in the Order does the ALJ conclude that Terkosky's alleged conduct" constitutes either immorality or misconduct in office. Appellant's Brief at 21. Terkosky therefore suggests that "the ALJ's Order is defective because it does not adequately resolve the factual issues necessary to the determination of the ultimate fact . . . nor does it make an ultimate finding of fact, *i.e.*, whether [she] committed conduct that constitutes 'immorality' or 'misconduct in office.'" Id.

25

Terkosky also argues that, rather than attempting to apply Section 7 utilizing applicable Indiana case law, the ALJ erroneously applied Morrison. She suggests an alternative framework by which to analyze whether her conduct was immoral or constituted misconduct in office. First, regarding immorality, she highlights this court's adoption in Fiscus of a definition set forth by the Pennsylvania Supreme Court. As noted below, the ALJ similarly noted the definition provided in Fiscus before discussing Morrison, in which the California Supreme Court identified certain factors to properly determine whether conduct was "immoral" or "unprofessional," and that the definition of what was "immoral" was somewhat amorphous. Terkosky also argues that "teachers are entitled to use reasonable force to maintain classroom order" and that "it would be contradictory to condemn as 'immoral' conduct that enjoys qualified immunity," and she cites to certain criminal cases for this proposition. Appellant's Brief at 27, 29; see State v. Fettig, 884 N.E.2d 341, 346 (Ind. Ct. App. 2008) (discussing "longstanding precedents" and noting that "they demonstrate the ability of the judiciary to determine whether a teacher has acted within the bounds of her authority to discipline when striking a student," and affirming the trial court's dismissal of a battery charge), reh'g denied; see also Barocas v. State, 949 N.E.2d 1256, 1257 (Ind. Ct. App. 2011) (reversing a special education teacher's battery conviction when she "'flicked' a student's tongue with her finger" in order to remind the student "to put her tongue back in her mouth," holding that the State failed to disprove her defense of parental privilege, and discussing in part Fettig); see also Littleton v. State, 954 N.E.2d 1070, 1076-1080 (Ind. Ct. App. 2011) (discussing Fettig and Barocas and holding that "what is educationally appropriate and

26

what is reasonable under the circumstances are not one and the same" in reversing the trial court, ordering that the charges against Littleton be dismissed based upon statutory qualified immunity as a teacher managing a classroom).

Regarding "misconduct in office," Terkosky notes that IDOE ALJs "have employed the plain meaning" of the phrase "misconduct in office," specifically using "the dictionary definition of 'misconduct,'" and suggests the definition "as 'behavior not conforming to prevailing standards of law; impropriety.'" Appellant's Brief at 30 (quoting In re Matter of Barocas, 0912-RV-006 (Ind. Dep't Educ. May 3, 2010)). She maintains that although Indiana case law has not addressed the phrase "misconduct in office" as it relates to the revocation of a teaching license, courts have contemplated the phrase in other contexts, and she cites to Med. Licensing Bd. v. Ward, 449 N.E.2d 1129 (Ind. Ct. App. 1983), in which this court reviewed a decision by the trial court to reverse the Medical Licensing Board of Indiana's decision to revoke Dr. Ward's license to practice chiropractic, in which the Board had determined that he "had engaged in 'willful or wanton misconduct'" in violation of a specific statute. She also cites to Matter of Edwards, 694 N.E.2d 701, 718-719 (Ind. 1998), which held that a lawyer engaged in misconduct by providing legal services in exchange for sexual favors. Id. at 31. She points to a definition of misconduct found in Black's Law Dictionary, noting that "[t]he generally accepted definition of 'misconduct in office' is any unlawful behavior by a public officer in relation to the duties of his office, willful in character." Id. at 31-32 (quoting BLACK'S LAW DICTIONARY 901 (5th ed. 1979)). [6]

---

[6] Because we find that the ALJ's reliance on Morrison was proper, we need not address these arguments. However, we do address further the definitions of "immorality" and "misconduct in office" in

Terkosky next argues that the ALJ's observation regarding the similarity between the Morrison factors to those in the Indiana Administrative Code is immaterial because 515 Ind. Admin. Code § 9-1-18(h) enumerates factors to be "used at reinstatement hearings when determining whether a teacher is fit to hold a license, or at fitness hearings when a teacher's initial application for licensure has been denied" and "[d]etermination of whether a teacher is fit to hold a teaching license is different from the determination of whether a teacher's conduct constitutes immorality or misconduct in office." Id. at 34-35. She contends that the seventh factor contained in 515 Ind. Admin. Code § 9-1-18(h) examines the extent to which the teacher has been rehabilitated which "is wholly irrelevant in a revocation proceeding," and "[a]ccordingly, it is clear the factors listed in the administrative regulations were not intended to be used in initial revocation hearings, but only in reinstatement and fitness hearings." Id. at 35. She maintains that "[i]nstead of conducting a factor analysis under Morrison, the ALJ should have examined Indiana law as it relates to the meaning of the terms 'immorality' and 'misconduct in office' in the license revocation context." Id.

The IDOE argues that the ALJ's Order was not arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, noting that it "stated that Terkosky's conduct in the various incidents showed a lack of good judgment and that it had adversely impacted one of the children involved," that it "recognized [her] conduct had a negative effect on the assistants who worked in her room," and that it recognized her "licenses were for special education and considered the fact that the students involved were elementary-age special needs students [to be] an aggravating factor in evaluating the

the penultimate section of this opinion below.

28

conduct." Appellee's Brief 15. Specifically, the IDOE observes the ALJ's analysis under Morrison, noting that "[b]etween the findings, the reasoning and the conclusions . . . the ALJ's findings and reasoning are extremely clear" and that "[t]here are no magic words that the ALJ must use to convey her findings and conclusions." Id. at 16.

The IDOE also argues that while Terkosky claims the use of the factors in Morrison is inappropriate, she fails to demonstrate why consideration of them is not persuasive or is contrary to Indiana law. It asserts that, to the extent the seventh factor listed in 515 Ind. Admin. Code § 9-1-18(h) is inapplicable to the instant case, that does not diminish the other factors as considerations to determine whether a suspension or revocation of a license is appropriate. The IDOE states that Terkosky ignores the fact that such factors are merely "*factors to be considered,*" that there is no requirement that all of the factors be met for the ALJ to reach a conclusion, and that "the ALJ did not ignore Indiana law in considering these factors[;] she used [them] to assist in making her determination as to the action, if any, required to be taken regarding Terkosky's teaching license." Id. at 22. The IDOE highlights that the exact *format* or *type* of evidence that is used to support the finding is irrelevant and that "[a]s long as there is evidence in the record upon which to make the finding, the format or type of that evidence does not matter." Id. at 25.

We note Conclusion 5 of the ALJ's Order, in which she discusses the relevant law she is to apply:

> There are no Indiana cases interpreting IC 20-28-5-7 or defining what constitutes immorality or misconduct for purposes of teacher license revocation. However, Indiana courts have considered the term "immorality" and generally have determined conduct to be immoral if the

29

conduct is offensive to the morals of the community and has a negative impact on the teacher's students. In *Fiscus v. Board of School Trustees,* 509 N.E.2nd 1137 (Ind. Ct. App. 1987) the court adopted a Pennsylvania Supreme Court definition of immorality as "not essentially confined to a deviation [from sex] morality; it may be such a course of conduct as offends the morals of the community and is a bad example to the youth whose ideals a teacher is supposed to foster and elevate." [Id.] (citing [Horosko, 6 A.2d at 868)]. The *Horosko* court's definition of immorality is not significantly different from the definition of "misconduct," as "behavior not conforming to prevailing standards or law; impropriety." *American Heritage Dictionary* at 802. The generally accepted definition of "misconduct in office," is "any unlawful behavior by a public officer in relation[] to the duties of his office, willful in character." *Black's Law Dictionary*, *Fifth Edition*, 901 (1979).

Appellant's Appendix at 135. The ALJ went on to discuss Morrison, noting that "[c]ourts in other jurisdictions have addressed teacher licensing disputes" and that Morrison is an "influential case" in that regard. Id.

In Morrison, the conduct at issue resulting in the revocation of petitioner Morrison's "life diplomas" involved a homosexual relationship between Morrison and another teacher in the public school system. 461 P.2d at 377-379. The California Supreme Court examined Section 13202 of the California Education Code, which "authorizes revocation of life diplomas for 'immoral conduct,' 'unprofessional conduct,' and 'acts involving moral turpitude,'" each of which had been alleged by the Board of Education and warranted revocation. 461 P.2d at 378-379. The court began its analysis by observing that such terms were of a "general" nature and applied "against the holders of a variety of certificates, licenses and government jobs other than teaching," and it had "not attempted to formulate explicit definitions of those terms which would apply to all the statutes in which they are used" and instead "have given those terms more precise meaning by referring in each case to the particular profession or the specific

30

governmental position to which they were applicable." Id. at 379. In a footnote, the court observed the "redundancy" of the terms "immoral conduct," "unprofessional conduct," and "moral turpitude," noting that they "substantially overlap one another" and "cover much the same conduct as 'evident unfitness for service,' which is also a ground for revocation of certificates under section 13202." Id. at 379 n.9.

The court examined past cases and suggested that they "give content to language which otherwise would be too sweeping to be meaningful" before noting that "[t]erms such as 'immoral or unprofessional conduct' or 'moral turpitude' stretch over so wide a range that they embrace an unlimited area of conduct." Id. at 382. It also observed: "That the meaning of 'immoral,' 'unprofessional,' and 'moral turpitude' must depend upon, and thus relate to, the occupation involved finds further confirmation in the fact that those terms are used in a wide variety of contexts." Id. at 385. After noting such different contexts, including "technicians, bioanalysts and trainees employed in clinical laboratories," "physicians," "pharmacists," and "employment agency officials," the court stated: "Surely the Legislature did not intend that identical standards of probity should apply to more than half a million professionals and government employees in widely varying fields without regard to their differing duties, responsibilities, and degree of contact with the public." Id. (footnote omitted). The court concluded "that the Board of Education cannot abstractly characterize the conduct in this case as 'immoral,' 'unprofessional,' or 'involving moral turpitude' within the meaning of section 13202 of the Education Code unless that conduct indicates that the petitioner is unfit to teach," id. at 386, and it identified eight factors which "are relevant to the extent that they assist the

31

board in determining a teacher's fitness to teach, i.e., in determining whether the teacher's future classroom performance and overall impact on his students are likely to meet the board's standards." Those factors are:

(1)     the likelihood that the conduct may have adversely affected students or fellow teachers;

(2)     the degree of such adversity anticipated;

(3)     the proximity or remoteness in time of the conduct;

(4)     the type of teaching certificate held by the party involved;

(5)     the extenuating or aggravating circumstances, if any, surrounding the conduct;

(6)     the praiseworthiness or blameworthiness of the motives resulting in the conduct;

(7)     the likelihood of the recurrence of the conduct; and

(8)     the extent to which disciplinary action may inflict an adverse impact or chilling effect upon the constitutional rights of the teacher involved or other teachers.

Id. at 386-387.[7]  The court reversed the decision of the superior court and remanded for further proceedings for "a careful and reasoned inquiry into his fitness to teach by the Board of Education," noting that "[t]he right to practice one's profession is sufficiently precious to surround it with a panoply of legal protection," and "terms such as 'immoral,' 'unprofessional,' and 'moral turpitude' constitute only lingual abstractions until applied to a specific occupation and given content by reference to fitness for the performance of that vocation." Id. at 394.

---

[7] We note that both the ALJ in her order and Terkosky in her brief address both the first and second factors in conjunction with one another.

Here, again the ALJ's Order in Conclusion 5 began by observing that Indiana cases have not interpreted or defined "what constitutes immorality or misconduct for the purposes of license revocation" and discussed Fiscus v. Bd. of Sch. Trs., in which this court adopted a definition of immorality set forth by the Pennsylvania Supreme Court, as well as a dictionary definition of "misconduct," before applying Morrison. Appellant's Appendix at 135. Although the ALJ did not specifically conclude that Terkosky's conduct was either immoral or constituted misconduct in office, we find it clear that the ALJ utilized the Morrison factors in order to determine whether Terkosky's conduct constituted the same, and that the application of Morrison was proper in this regard.

Moreover, the ALJ also recognized the similarity between the Morrison factors and the factors provided by 515 Ind. Admin. Code § 9-1-18(h), which is the mechanism the IDOE applies in considering whether to reinstate a teaching license, as reason for applying Morrison to this case. We observe that 515 Ind. Admin. Code § 9-1-18(h) lists the following factors:

(1)     The likelihood the conduct or offense adversely affected, or would affect, students or fellow teachers, and the degree of adversity anticipated.

(2)     The proximity or remoteness in time of the conduct or offense.

(3)     The type of teaching credential held or sought by the individual.

(4)     Extenuating or aggravating circumstances surrounding the conduct or offense.

(5)     The likelihood of recurrence of the conduct or offense.

(6)     The extent to which a decision not to issue the license would have a chilling effect on the individual's constitutional rights or the rights of other teachers.

33

(7)    Evidence of rehabilitation, such as participation in counseling, self-help support groups, community service, gainful employment subsequent to the conduct or offense, and family and community support.

Thus, the only substantive difference between the <u>Morrison</u> factors and those listed in 515 Ind. Admin. Code § 9-1-18(h) is that, in place of the seventh factor in the Indiana Administrative Code, evidence of rehabilitation, the test in <u>Morrison</u> contains a factor to examine the praiseworthiness or blameworthiness of the motives resulting in the conduct (listed above as the fifth factor).[8]   Again, we cannot say that the ALJ's reference to <u>Morrison</u> was improper.[9]

3.    *Whether the ALJ's Order was Supported by Substantial Evidence*

Having determined that the ALJ's reliance upon the <u>Morrison</u> factors was proper, we last review whether the ALJ's findings are supported by substantial evidence, i.e., whether the evidence was adequate to support the conclusion that Terkosky's conduct constituted immorality or misconduct in office.  Terkosky argues that even if analysis under <u>Morrison</u> and 515 Ind. Admin. Code § 9-1-18(h) is appropriate, "there is not sufficient evidence in the administrative record to support a finding of immorality or misconduct under the <u>Morrison</u> analysis."  Appellant's Brief at 36.  She notes that the ALJ's findings "indicate that some of the <u>Morrison</u> factors favor [her], and many of the factors are ambiguous at best."  <u>Id.</u>  Specifically, she suggests that the first and seventh

---

[8] 515 Ind. Admin. Code § 9-1-18(h) also combines the first and second factor from <u>Morrison</u> into one factor.

[9] We observe that at the March 6, 2012 hearing before the trial court, Terkosky's counsel noted that ALJs for the IDOE have been citing to <u>Morrison</u> "for the last ten years in their administrative decisions."  Transcript at 13.

factors favor her, the third, fourth, fifth, and sixth factors are ambiguous, and the eighth factor is "inapposite." Id. at 37-39.

The IDOE argues that the ALJ correctly concluded that Terkosky's conduct in the various incidents showed a lack of good judgment, adversely impacted one of the children, and had a negative effect on the assistants who worked in her room. The IDOE highlights that the March 3, 2010 incidents were not remote. It notes that the ALJ recognized that Terkosky's licenses were for special education and that the students were elementary-age special needs students, which "was an aggravating factor in evaluating the conduct." Appellee's Brief at 15. The ALJ also noted in mitigation Terkosky's "expressed motivation to keep one child from choking on an eraser . . . ." Id. The IDOE asserts that, "[w]ith respect to praiseworthiness or blameworthiness, the ALJ considered the professed intent to help the one child but balanced it against the frustration that seemed to motivate Terkosky's actions." Id. The IDOE notes that the ALJ concluded that the likelihood of recurrence was low because Terkosky was no longer employed as a teacher, and the ALJ "found there would be no chilling effect on teachers' exercise of constitutional rights." Id. Finally, the IDOE contends that Terkosky's arguments are merely an invitation for this court to reweigh the evidence.

The ALJ's Order applied the Morrison factors as follows:

Likelihood that the conduct may have adversely affected students or fellow teachers: The only students that could be adversely impacted are those in [Terkosky's] classroom. There is no evidence that the student subject to [her] alleged discipline in September 2008 was in distress, nor is there evidence that any other students in the classroom exhibited an adverse reaction by witnessing the discipline. The PT aide reporting the incident was disturbed to make the report but the other paraprofessional assigned to the room has no recollection of the discipline. No other teachers were

35

adversely affected.  As for the Mar. 3, 2010 incidents, there is no evidence that the incidents adversely impacted any students other than M.N. and M.F.  M.N. may have suffered a bruise from the firm grip [Terkosky] had on her arm while she was trying to pull away, but it is equally possible the bruise is from an unknown source.  After brief tears, M.N[.] was observed back to her "usual self."  It seems more likely that M.F. was adversely affected by [Terkosky's] conduct on Mar. 3.  Regardless of whether [Terkosky's] motivation to act was praiseworthy, her execution showed lack of good judgment.  M.F. has experienced bedwetting and anxiety about returning to [Terkosky's] presence at school even though [she] is no longer teaching there.  The instructional aides in [Terkosky's] classroom experience some degree of negative impact due to [Terkosky's] conduct but since she is no longer employed at the school the impact is largely mitigated.

The proximity or remoteness in time of the conduct:  The September 2008 incident is far removed at this point.  However, the Mar. 2010 incidents are recent and fresh in the minds of those involved.

The type of teaching certificate held by the party involved:  [Terkosky] holds a license to teach students with a variety of special needs.

Extenuating or aggravating circumstances:  The fact that all students involved in the incidents are elementary aged special needs students is an aggravating circumstance.  An extenuating circumstance of the M.F[.] incident is [Terkosky's] expressed motivation of acting to try to safeguard M.F. from choking by trying to take an eraser that may have been in her mouth, in whole or in part[.]

Praiseworthiness or blameworthiness of the motives resulting in the conduct:  There is a balance for this factor between the praiseworthiness of [Terkosky] wanting to safeguard M.F[.] from possible choking on an eraser and the blameworthiness of the frustration which motivated, at least in part, her conduct with M.N.

The likelihood of the recurrence of the conduct:  The likelihood of recurrence is very small since [Terkosky] is no longer employed as a teacher.

The extent to which disciplinary action may inflict an adverse impact or chilling effect upon the constitutional rights of the teacher involved or other teachers:  There is no chilling effect on the constitutional rights of [Terkosky] because due process is being provided.

36

Appellant's Appendix at 136. Based upon this analysis, the ALJ concluded that a suspension of Terkosky's teaching licenses for two years was warranted, noting that "the most serious aggravating factor is that all students involved . . . are young special needs students," but that there were "extenuating factors present under the *Morrison* analysis" which cut against revocation. Id. at 137.

We find that Terkosky's arguments amount to an invitation to reweigh the evidence, which we may not do. However, to the extent that the ALJ in this case failed to specifically identify whether Terkosky's actions were problematic under either the "immorality" or "misconduct in office" prongs of Section 7, we discuss the definitions of each term and apply them to the incidents at issue. First, as noted by both the ALJ and the parties in their briefs, this court has addressed "what constitutes immorality by a teacher" in Fiscus, which recognized an "oft-cited" definition provided by the Pennsylvania Supreme Court in Horosko, as "not essentially confined to a deviation from sex morality; it may be such a course of conduct as offends the morals of the community and is a bad example to the youth whose ideals a teacher is supposed to foster and to elevate." 509 N.E.2d at 1141 (quoting Horosko, 6 A.2d at 868). The court also noted that "such a general concept . . . is subject to varying interpretations based on shifting social attitudes," and accordingly it "must be resolved on the facts and circumstances of each case."[10] Id.

Specifically, in Fiscus the court examined the cancellation of a teacher's contract on the basis of immorality for "the single utterance of an obscenity during a 5th-grade art

---

[10] Indeed, the California Supreme Court made the same observation in Morrison and identified the factors in order to assist in making such determinations.

class . . . ."[11] Id. at 1138. At a hearing held before the school board, the mother of the child to whom the obscenity had been directed testified that Fiscus had previously given the child "a 'D' in physical education," that the child's mother had complained to the principal and demanded that something be done, and that the incident had had an effect on the child, noting that "when he sees Fiscus or a vehicle resembling her truck he panics; he had suffered from diarrhea; and he had lost weight." Id.

The court noted that the record revealed the teacher "had an unblemished record in her 12 years of experience," and it acknowledged that it had "grave misgivings regarding the justice of this matter" regarding its belief that this incident had occurred the way it had been interpreted by the school board, but it ruled that under the relevant standard of review "we may not weigh the evidence nor adjudge the credibility of the witnesses, even if we might have drawn a different conclusion. The issue is simply whether the School Board believed the students or the teacher. It believed the students, and we hold the evidence is sufficient." Id. at 1138, 1140-1141 (citation omitted). The court ultimately affirmed the cancellation of Fiscus's contract, citing to a number of out-of-state cases upholding the cancellation of a teacher's contract "because of the in-school use of offensive language" and holding that "[g]iven the above holdings, and the facts that the phrase was uttered during class but not for educational purposes, we do not believe the School Board abused its discretion in concluding that Fiscus's conduct constituted immorality." Id. at 1142.

---

[11] Fiscus was reported to have said "[f]uck you" in the presence of twenty-four children, in which "six, aged either 10 or 11 years, testified [that] they had heard the obscene remark." 509 N.E.2d at 1138.

38

Regarding misconduct in office, we observe that neither this court nor the Indiana Supreme Court has addressed the definition as squarely as is the case with immorality. However, we have recognized as instructive a case holding that "'[m]isconduct' justifying suspension or revocation of a professional license includes acts done in persistent disregard of the law, those which are malum in se . . . , and those which offend generally accepted standards of conduct within the profession, thereby jeopardizing the interests of the profession and the public it serves." Ward, 449 N.E.2d at 1139 (quoting Richardson v. Fla. State Bd. of Dentistry, 326 So.2d 231, 233 (Fla. Dist. Ct. App. 1976)). This definition notes multiple ways in which misconduct in office may be present, from committing criminal acts, to acts which are inherently immoral (or malum in se), to acts posing an affront to a certain profession's generally accepted standards of conduct.[12]

Although the incident involving M.F. in which Terkosky "popped" M.F. in the mouth was supposedly to remove an eraser and prevent M.F. from choking, the other incidents do not appear to present an element of student safety. The September 2008 incident involving the student standing between an easel and a chalkboard, in which Terkosky struck the easel multiple times with a yardstick and at one point draped an opaque plastic sheet over the child's head, was supposedly performed with a disciplinary aim in mind (although Terkosky testified that she did not recall the incident, so she did not explain her reasons). This incident, however, caused Judy Thrasher, an assistant in Terkosky's classroom, to take action by reporting to Terkosky's superior, Weinheimer,

---

[12] We note that this illustrates the level of overlap between the "immorality" and "misconduct in office" prongs of Ind. Code § 20-28-5-7.

39

what she had witnessed, which in turn caused Weinheimer to meet with Terkosky and discuss the incident and advise her not to use this technique in the future.

The incidents involving M.N. similarly do not entail a student safety issue. Indeed, the ALJ's findings indicate that M.N. may have suffered bruising on her arm due to Terkosky's handling of her, grabbing her, and placing her firmly in her chair. The assistants in Terkosky's classroom on that same day appeared to hear Terkosky "smack" M.N., and that although neither assistant Baker or Smith saw what occurred, upon hearing the smacking sound "Baker turned to observe M.N. with her hands up to her face, crying. Smith, who was in a curtained changing area with a student, observed M.N[.] crying, hands to her face, when she exited the changing area several minutes later. Baker observed [Terkosky's] demeanor as 'a little frustrated.'" Appellant's Appendix at 132. Terkosky's arguments ignore this incident.

We also note that even with regard to the incident involving M.F., in which Terkosky "popped" M.F. in the mouth to supposedly remove an eraser, there was a disciplinary element present in her actions as Terkosky ordered M.F. to ride the second bus home which was a form of punishment. Also Patterson, an assistant in Terkosky's classroom, heard Terkosky state that "now M.F. can see how mean [Terkosky] really can be," although it was unclear whether Terkosky was referencing the "pop" on the mouth or making M.F. ride the second bus. Id. at 133. Patterson did not observe any sign that M.F. was choking and she did not see M.F. spit out an eraser.

CONCLUSION

In addition to disciplining M.F. by making her ride the second bus, Terkosky's acts all involved becoming physical with her students. Such acts, especially when viewed together, were found to have offended generally accepted standards of conduct of teachers and accordingly constituted misconduct in office.[13] We find that substantial evidence was present to support the ALJ's findings, and the ALJ's conclusion that a two-year suspension was warranted was not contrary to law. Accordingly we conclude that the trial court did not err in affirming the ALJ's Order.

For the foregoing reasons, we affirm the trial court's denial of Terkosky's petition for judicial review and affirming the decision of the IDOE to suspend Terkosky's teaching license for two years.

Affirmed.

BAKER, J., and BRADFORD, J., concur.

---

[13] We note that nothing in our opinion today should be interpreted as holding that teachers are barred from reasonable physical contact to maintain classroom order in a manner which does not offend generally accepted standards of conduct for teachers.