

**FILED**

May 24 2018, 5:41 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Terry A. White
Olsen & White, LLP
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Frances Barrow
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Gerald G. Gray, <br> *Appellant-Petitioner,* <br><br> v. <br><br> Medical Licensing Board of Indiana, <br> *Appellee-Respondent.* | May 24, 2018 <br><br> Court of Appeals Case No. <br> 26A01-1707-PL-1595 <br><br> Appeal from the Gibson Superior Court <br><br> The Honorable Robert R. Aylsworth, Judge <br><br> Trial Court Cause No. <br> 26D01-1510-PL-1084 |

**Pyle, Judge.**

## Statement of the Case

[1] Dr. Gerald Gray ("Dr. Gray") appeals the denial of his petition for judicial review of an order issued by the Medical Licensing Board of Indiana ("the Board") indefinitely suspending his medical license. Dr. Gray specifically

contends that the trial court should have granted his petition for judicial review because there is not substantial evidence to support the suspension. Concluding that substantial evidence supports the suspension, we affirm the trial court's denial of Dr. Gray's petition.

We affirm.

# Issue

Whether the trial court erred in denying Dr. Gray's petition for judicial review.

# Facts

Seventy-nine-year-old Dr. Gray is an osteopathic physician who practices in southern Indiana. He was issued an Indiana medical license in June 1963. In 2004, Dr. Gray hired an unlicensed physician to treat his patients. Dr. Gray paid this unlicensed physician $20.00 per hour but submitted claims to Medicaid and insurance companies at his standard rates and under his name. Dr. Gray also allowed the unlicensed physician to prescribe controlled substances under Dr. Gray's Drug Enforcement Agency ("DEA") registration number. In 2005, Dr., Gray voluntarily surrendered his DEA registration number. In 2006, Dr. Gray pled guilty to one count of Medicaid fraud, and the Board placed him on indefinite probation with a list of terms and conditions, including continuing training, community service, and a fine.

Later in 2006, Dr. Gray filed an application for a new DEA registration. The DEA approved Dr. Gray's application pursuant to the terms of a 2007

Memorandum of Understanding ("MOU") that was scheduled to expire in early 2010. In the MOU, Dr. Gray agreed to abide by all state and federal laws relating to controlled substances. He also agreed not to prescribe, dispense, or administer any controlled substance to himself or any person with whom he did not have a legitimate doctor-patient relationship. He further agreed to prescribe controlled substances in a reasonable quantity for a legitimate medical purpose and to maintain a complete and accurate record of all controlled substances that he prescribed or maintained.

[5] In May 2009, Dr. Gray filed an application to renew his Indiana Controlled Substance Registration ("CSR"). Question number two on the application asked if he had ever had any action, discipline, or revocation on his DEA registration or if he had ever entered into an MOU on the registration. Dr. Gray responded that he had not.

[6] Also in 2009, C.P. began working as a housekeeper for Dr. Gray, and they soon began dating. From June 2009 through October 2009, Dr. Gray wrote C.P. eighteen controlled substance prescriptions. In October 2009, C.P. admitted to Dr. Gray that she had a "drug problem." (Tr. 102). C.P. moved into Dr. Gray's house in November 2009. In early 2010, Dr. Gray learned that C.P. was addicted to prescription narcotics.

[7] In February 2010, Dr. Gray received authorization to prescribe Schedule III-V FDA approved narcotics for addiction treatment and began treating C.P. From February through October 2010, Dr. Gray wrote fourteen controlled substance

prescriptions for C.P. In late 2010, C.P. sought treatment for her addiction at a local behavioral healthcare system. She subsequently stopped attending the treatment program, and Dr. Gray prescribed her Xanax. From January through March 2011, Dr. Gray gave C.P. intra-muscular shots, including Morphine, Demerol, Nubian, Morphine Sulfate, and Dilaudid.

[8] In the spring of 2011, Board of Pharmacy Investigator Eric Pearcy ("Investigator Pearcy") and Indiana State Police Detective Vinnie Geiselman ("Detective Geiselman") contacted Madeline Kuzma ("Investigator Kuzma"), an investigator with the DEA. Investigator Kuzma is responsible for enforcement of the Controlled Substance Act as it applies to pharmaceutical controlled substances. Investigator Pearcy and Detective Geiselman expressed concerns about the combinations of controlled substances that Dr. Gray was prescribing to his patients, the fact that many patients were coming from as far away as Illinois to see Dr. Gray, and the fact that Dr. Gray was prescribing numerous controlled substances to C.P., who was known to be Dr. Gray's girlfriend and who was currently working in Dr. Gray's office.

[9] Investigator Kuzma visited Dr. Gray's office in May 2011 and noted that Dr. Gray did not keep accurate records of the controlled substances in his office. In addition, Dr. Gray kept the Xanax that he dispensed to C.P. in a safe in his private residence. He also dispensed the Xanax to other patients. When Investigator Kuzma told Dr. Gray that his home was not a registered location for dispensing drugs and that dispensing drugs from an unregistered location was prohibited by federal regulations, Dr. Gray responded that he did not know

that. Dr. Gray told Investigator Kuzma that he also did not know that he had violated federal regulations when he had prescribed hydrocodone, a Schedule II controlled substance, to C.P. for her opioid withdrawal while knowing that C.P. was an addict.[1] Investigator Kuzma further told Dr. Gray that he had also violated DEA regulations when he failed to report that he had suspected that an employee had stolen a controlled substance. In addition, Investigator Kuzma learned that in April 2011, Dr. Gray had prescribed Suboxone for C.P. She only took one dose of the drug, which she claimed made her nauseous. Dr. Gray kept the Suboxone pills in his office and dispensed it to other patients.

[10] In October 2014, Dr. Gray filed a petition to remove the probation that had been imposed in 2006. In early 2015, the State received a notification from a local pharmacist that she was refusing to fill controlled substance prescriptions for Dr. Gray's patients. In May 2015, the State filed a five-count administrative complaint against Dr. Gray's medical license. The Board held a hearing in September 2015 on both the complaint and Dr. Gray's motion to withdraw his probation.

[11] In October 2015, the Board issued a detailed order that found five violations of INDIANA CODE § 25-1-9-4. Specifically, the Board concluded that Dr. Gray had violated: (1) INDIANA CODE § 25-1-9-4(a)(4)(A) when he administered narcotic

---

[1]Pursuant to 21 C.F.R. § 1306.07(d), a practitioner is not authorized to dispense a schedule II controlled substance for maintenance or detoxification treatment. Pursuant to 21 C.F.R. § 1308.12, Hydrocodone is a Schedule II controlled substance.

controlled substances to C.P. to treat her opioid addiction; (2) INDIANA CODE § 25-1-9-4(a)(4)(B) when he failed to keep abreast of current practices when he prescribed and/or administered controlled substances to C.P., a known drug addict, and other patients without objective evidence of medical necessity; (3) INDIANA CODE § 25-1-9-4(a)(9) when he knowingly prescribed or administered a narcotic, addicting, or dangerous drug to C.P., an addict; (4) INDIANA CODE § 25-1-9-4(a)(1)(A) when he engaged in or knowingly cooperated in fraud or material deception in order to obtain a license to practice as evidenced by his failure to disclose the MOU containing limitations on his DEA registration when he renewed his application for CSR in 2009; and (5) INDIANA CODE § 25-1-9-4(a)(1)(A) in that he engaged in or knowingly cooperated in fraud or material deception in order to obtain a license to practice as evidenced by his failure to disclose the MOU containing limitations on his DES registration when he renewed his application for a CSR in 2011. As a result of these violations, the Board indefinitely suspended Dr. Gray's medical license.

[12] Shortly thereafter, Dr. Gray filed a petition for judicial review wherein he asked the trial court to review the Board's actions in suspending his license and to approve his petition requesting the withdrawal of his probationary status. The gravamen of his argument was that there was not substantial evidence to support the five statutory violations that resulted in the suspension of his medical license. The trial court denied Dr. Gray's petition, and Dr. Gray now appeals that denial.

# Decision

[13] Dr. Gray argues that the trial court erred in denying his petition for judicial review of an order wherein the Board indefinitely suspending his medical license. The Administrative Orders and Procedures Act ("AOPA") governs the judicial review of decisions made by the Board. IND. CODE § 4-21.5-2-0.1. Agency action subject to AOPA will be reversed only if the court determines that a person seeking judicial relief has been prejudiced by an agency action that is: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence. *Terkosky v. Indiana Dept. of Educ.*, 996 N.E.2d 832, 841-42 (Ind. Ct. App. 2013).

[14] A trial court and an appellate court both review the decision of an administrative agency with the same standard of review. *Id.* at 842. We defer to the agency's expertise and will not reverse simply because we might have reached a different result. *Id.* The burden of demonstrating the invalidity of the agency action is on the party to the judicial review proceeding that is asserting the invalidity of the action. *Id.* (citing IND. CODE §4-21.5-5-14(a)). Review of an agency's decision is largely confined to the agency record, and the court may not substitute its judgment for that of the agency. *Id.* We give deference to the administrative agency's findings of fact, if supported by substantial evidence,

but review questions of law *de novo*. *Id.* On review, we do not reweigh the evidence. *Id.*

[15] The Board regulates the practice of medicine within Indiana and is charged with establishing standards for the competent practice of medicine in the state. IND. CODE § 25-22.5-2 *et seq.* The Board's general authority to suspend medical licenses derives from INDIANA CODE § 25-1-9-9, which provides that the Board may suspend a practitioner's license if it finds that the practitioner is subject to disciplinary sanctions under INDIANA CODE § 25-1-9-4. At the time the State filed its administrative complaint seeking disciplinary sanctions against Dr. Gray, INDIANA CODE § 25-1-9-4 provided as follows:

> (a) A practitioner shall conduct the practitioner's practice in accordance with the standards established by the board regulating the profession in question and is subject to the exercise of the disciplinary sanctions under section 9 of this chapter if, after a hearing, the board finds:
>
> (1) a practitioner has:
>
>> (A) engaged in or knowingly cooperated in fraud or material deception in order to obtain a license to practice, including cheating on a licensing examination;
>>
>> (B) engaged in fraud or material deception in the course of professional services or activities;
>>
>> (C) advertised services in a false or misleading manner; or
>>
>> (D) been convicted of a crime or assessed a civil penalty involving fraudulent billing practices, including fraud under:
>>
>>> (i) Medicaid (42 U.S.C. 1396 et seq.);

(ii) Medicare (42 U.S.C. 1395 et seq.);

(iii) the children's health insurance program under IC 12-17.6; or

(iv) insurance claims;

(2) a practitioner has been convicted of a crime that:

(A) has a direct bearing on the practitioner's ability to continue to practice competently; or

(B) is harmful to the public;

(3) a practitioner has knowingly violated any state statute or rule, or federal statute or regulation, regulating the profession in question;

(4) a practitioner has continued to practice although the practitioner has become unfit to practice due to:

(A) professional incompetence that:

(i) may include the undertaking of professional activities that the practitioner is not qualified by training or experience to undertake; and

(ii) does not include activities performed under IC 16-21-2-9;

(B) failure to keep abreast of current professional theory or practice;

(C) physical or mental disability; or

(D) addiction to, abuse of, or severe dependency upon alcohol or other drugs that endanger the public by impairing a practitioner's ability to practice safely;

(5) a practitioner has engaged in a course of lewd or immoral conduct in connection with the delivery of services to the public;

(6) a practitioner has allowed the practitioner's name or a license issued under this chapter to be used in connection with an individual who renders services beyond the scope of that individual's training, experience, or competence;

(7) a practitioner has had disciplinary action taken against the practitioner or the practitioner's license to practice in any state or jurisdiction on grounds similar to those under this chapter;

(8) a practitioner has diverted:

> (A) a legend drug (as defined in IC 16-18-2-199); or

> (B) any other drug or device issued under a drug order (as defined in IC 16-42-19-3) for another person;

(9) a practitioner, except as otherwise provided by law, has knowingly prescribed, sold, or administered any drug classified as a narcotic, addicting, or dangerous drug to a habitue or addict;

(10) a practitioner has failed to comply with an order imposing a sanction under section 9 of this chapter;

(11) a practitioner has engaged in sexual contact with a patient under the practitioner's care or has used the practitioner-patient relationship to solicit sexual contact with a patient under the practitioner's care;

(12) a practitioner who is a participating provider of a health maintenance organization has knowingly collected or attempted to collect from a subscriber or enrollee of the health maintenance organization any sums that are owed by the health maintenance organization; **or**

(13) a practitioner has assisted another person in committing an act that would be grounds for disciplinary sanctions under this chapter.

(b) A practitioner who provides health care services to the practitioner's spouse is not subject to disciplinary action under subsection (a)(11).

(c) A certified copy of the record of disciplinary action is conclusive evidence of the other jurisdiction's disciplinary action under subsection (a)(7).

(Emphasis added).

[16] Here, Dr. Gray argues that the trial court erred in denying his petition for judicial review because there is not substantial evidence to support the Board's findings that he violated five of the statutes' subsections. However, we note that this statute includes the word "or" after subsection twelve and is therefore written in the disjunctive. *See Bourbon Mini-Mart, Inc. v. Comm'r Ind. Dep't of Env't Mgmt.*, 806 N.E.2d 14, 20 (Ind. Ct. App. 2004). Accordingly, practitioners are subject to the exercise of disciplinary sanctions if the Board finds after a hearing that the practitioner has violated any one of the thirteen subsections, and we can affirm a suspension where there is substantial evidence of just one violation. *See U.S. Steel Corp. v. N. Ind. Pub. Serv. Co.*, 951 N.E.2d 542, 559 (Ind. Ct. App. 2011), *trans. denied*.

[17] We now turn to the merits of the case and review one of the Board's Ultimate Findings of Fact. The Board's order provides, in relevant part, as follows:

> 2. By a vote of 4-0-0, [Dr. Gray's] conduct as described above constitutes a violation of IND. CODE § 25-1-9-4(a)(1)(4)(B) in that [Dr. Gray] failed to keep abreast of current theory and practice when he prescribed and/or administered narcotic controlled substances to CP, a known drug addict[,] and other patients

without objective evidence of medical necessity for the prescribed narcotic medication.

(App. 44). Dr. Gray claims that this finding "is unsupported by substantial evidence, not reasonably inferred from the [f]acts, and is defective as a basis for disciplining Dr. Gray's medical license." (Dr. Gray's Br. 20). Specifically, he first contends that Board's "[i]nclusion of 'and other patients' . . . is unsupported by any evidence and should be stricken prior to further assessment . . . ." (Dr. Gray's Br. 20). However, our review of the evidence reveals that a pharmacist refused to fill controlled substance prescriptions for Dr. Gray's patients. In addition, Dr. Gray kept C.P.'s prescription for Suboxone in his office and admitted that he had dispensed the remaining pills to other patients. He also kept Xanax locked in a safe at his private residence, which was an unregistered location with the DEA, and dispensed it to both C.P. and other patients. This evidence clearly supports the Board's inclusion of "and other patients" in the Board's order. We find no error.

[18] Dr. Gray further contends that there is not substantial evidence that he "treated C.P., or any other patient, with narcotics without objective evidence of medical necessity for the prescribed medication." (Dr. Gray's Br. 21). In other words, Dr. Gray claims that there is objective evidence of medical necessity for prescribing narcotics to C.P. However, our review of the evidence reveals that Dr. Gray prescribed hydrocodone to C.P. for withdrawal even though he knew that she was addicted to narcotics. There is clearly no evidence of medical necessity in the record for prescribing hydrocodone to a narcotics addict for

withdrawal. Rather, prescribing hydrocodone to someone who is addicted to narcotics for detoxification treatment is a violation of federal regulations. *See* C.F.R. 21 C.F.R. §§ 1306.07(d) and 1308.12. As a result, we find that there is substantial evidence to support the Board's finding that Dr. Gray treated C.P. with narcotics without objective evidence of medical necessity.

[19] Lastly, Dr. Gray complains that the "State did not produce one doctor or other qualified healthcare professional to testify as to the validity of . . . Dr. Gray's medical decisions versus the documented patient assessments." (Dr. Gray's Br. 23). However, the State was not required to do so. The legislature has recognized that the Board, which is composed of six physicians, is able to establish standards and determine whether a practitioner has violated one or more of them. *See* IND. CODE § 25-22.5-2-1; IND. CODE § 25-1-9-4(a). There is no need for another physician to testify as to the validity of a practitioner's medical decisions. We find no error.

[20] The evidence in this case provides substantial support for the Board's decision, and Dr. Gray's license suspension was supported by substantial evidence. We therefore affirm the trial court's denial of Dr. Gray's petition for judicial review. *See Regester v. Ind. State Bd. of Nursing*, 703 N.E.2d 147, 151 (Ind. 1998) (finding substantial evidence to support the Nursing Board's suspension of a nurse's

license and affirming the trial court's denial of the nurse's petition for judicial review of the suspension).[2]

Affirmed.


Kirsch, J., and Bailey, J., concur.

---

[2] Dr. Gray also argues that "I.C. § 25-1-9-4 *et seq.*, as applied by the Board to Dr. Gray's conduct, are unconstitutionally vague, thus denying due process, due to lack of a stated standard of care to which Dr. Gray's actions can be judged." (Dr. Gray's Br. 30). However, we agree with the State, that this argument "continues to center around what [Dr. Gray] sees as a lack of an established standard of care." (State's Br. 35). We have already explained that the Board has statutory authority to establish standards and determine whether a practitioner has violated one or more of them. *See* I.C. § 25-1-9-4(a). No standard of care testimony was necessary.